IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-2565-RM-MJW

WELLS FARGO INSURANCE SERVICES USA, INC.,

            Plaintiff,

v.

GLENN W. MCQUATE,
PAUL PROUTY, and
MARY WONG

            Defendants.

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants Glenn McQuate, Paul Prouty, and Mary Wong, by their undersigned counsel and in accordance with Federal Rule of Civil Procedure 56, respectfully request summary judgment in their favor and against Plaintiff Wells Fargo Insurance Services USA, Inc.

## I.   <u>INTRODUCTION</u>

Ms. Wong and Messrs. McQuate and Prouty worked for Plaintiff Wells Fargo Insurance Services, USA, Inc. ("Wells Fargo") assisting mining companies in the procurement and placement of their insurance coverage. In August 2014, these individuals informed Wells Fargo, their then employer, that they would be leaving their employment. Prior to making this decision, they had discussed with Wells Fargo management their concerns with their work environment and their ability to service their clients. In response to being informed that these individuals were leaving, Wells Fargo summarily discharged them. Less than one month later, Wells Fargo sued them alleging that they had breached their employment contracts, misappropriated trade secrets, engaged in unfair competition, amongst other claims.

Wells Fargo attempts to ignore the fact that neither Ms. Wong, Mr. McQuate, nor Mr. Prouty have breached any valid covenant not to compete or non-solicitation obligation.  It is a bedrock principle of Colorado law that non-compete agreements are void unless they fall within one of the statutory exceptions.  Here, the two exceptions relied upon by Wells Fargo require it to prove that the Defendants are "management personnel" or that Wells Fargo is enforcing a contract for the protection of legitimate trade secrets.  Wells Fargo has failed on both counts.  Without such a showing, Wells Fargo would have this Court impose on Defendants (and other Wells Fargo employees in the future) a prohibition against pursuing legitimate employment goals and would effectively communicate to all other Wells Fargo employees that they cannot leave their jobs to work for competitors, lest they be sued under strained interpretations of their employment agreements.

Defendants respectfully ask this Honorable Court to look past Wells Fargo's conclusory rhetoric and uphold the right of each employee to choose his or her employment without the unjustified threats of prior employers to enforce unenforceable restrictive agreements.  When the smoke clears and the focus is on the law and the undisputed facts, Defendants are entitled to summary judgment on all of Wells Fargo's claims.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

This case arises from Ms. Wong and Messrs. McQuate and Prouty's change of employment from Wells Fargo to McGriff, Seibels, & Williams.  (Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment ("SOF"), 1.)

---

[1] For ease of reference, the following statement of undisputed material facts presents a brief narrative background of the case.  In accordance with the Court's March 2015 practice standards, all of the undisputed facts (including those in the narrative) are set forth in "Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment," filed concurrently herewith.

Prior to their employment at Wells Fargo, Ms. Wong and Messrs. McQuate and Prouty each had unique and extensive experience in the insurance industry.  Mr. McQuate began working in the insurance industry in 1977.  (SOF at 2.)  Over twenty years later, in 2001, he became an employee of Wells Fargo upon Wells Fargo's acquisition of Acordia of West Virginia.  (*Id*. at 12.)  In the twenty years prior to working for Wells Fargo, Mr. McQuate was employed as an underwriter, a marketing representative, an account executive, a senior vice president, and a profit center manager.  (*Id*. at 3.)

Mr. Prouty worked at Wells Fargo for less than sixteen months.  (Compl. ¶16.)  His prior experience in the mining insurance industry, however, exceeded fifteen years.  (SOF at 4.)  Prior to working at Wells Fargo, Mr. Prouty worked for two of Wells Fargo's competitors, including having served as a Managing Director at Marsh & McClennan, and an Executive Vice President at Willis.  (*Id.* at 5.)   Additionally, he worked for seven years at Newmont Mining Corporation, first as a risk manager and then as Group Executive for the Global Risk Management Group; and for one year at Jardine Lloyd Thompson Group as the Managing Director, Head of Mining.  (*Id.* at 6.)  Jardine Lloyd Thompson Group is one of the world's largest providers of insurance and reinsurance services.  (*Id.*)  Wells Fargo admits that "this prior experience permitted Prouty to both understand the risks of current and prospective mining clients and to strategically address them with an individualized insurance coverage structure."  (*Id*. at 7.)

Ms. Wong worked at Wells Fargo for a relatively short period of time as well as she began her employment on January 1, 2012.  (Compl. ¶19).  Prior to her employment at Wells Fargo, Ms. Wong had worked in the mining and energy insurance industry since approximately 1989.  (SOF at 8.)  From 1995 to 2011, Ms. Wong worked in risk management for various companies, including RAG American Coal Holdings, Inc., Foundation Coal Corp., and Alpha Natural Resources.  (*Id.*

at 9.)  Wells Fargo acknowledges that Ms. Wong's prior experience "provided her with unique insight and an ability to quickly understand the complex needs and risk profiles of current and potential mining, energy, and other clients…."  (*Id*. at 10.)   Wells Fargo also found her relationships with people in the mining and energy business to be advantageous.  (*Id*. at 11.)

At Wells Fargo, the Defendants worked with the financial officers and risk managers of mining clients to assist them in the procurement of insurance coverage for their companies.  (SOF 19.)  In order to do so, the clients would provide to the Defendants their company information, some of which was considered confidential to the client.  (*Id*. at 20.)  Some clients required Wells Fargo to enter into a non-disclosure agreement prohibiting Wells Fargo from disclosing its confidential information.  (*Id*. at 21.)  Others did not impose such a requirement upon Wells Fargo.  (*Id*.)  Much of the information was publicly available and the Defendants would conduct their own research, particularly concerning prospective clients, utilizing public information.  (*Id*. at 20, 77.)  Importantly, the information belonged to the clients, all of whom were free to do with it as they chose.  (*Id*. at 70.)

In January 2014, Wells Fargo announced a sale of forty-two of its U.S. offices, including the ones that Ms. Wong and Messrs. McQuate and Prouty reported to, and had relied upon for support.  (SOF 25, 29, 32, 33.)  The sale was completed on or about May 2, 2014.  (*Id*. at 25.)  Approximately seventy-five percent of Mr. McQuate's book of business was included in the sale.  (*Id*. at 27.)   After the sale to USI, Ms. Wong and Messrs. McQuate and Prouty expressed their concerns to Wells Fargo management as to Wells Fargo's ability to service its remaining clients.  (*Id*. at 29, 31, 33.)  Over time, as their concerns were not addressed, Ms. Wong and Messrs. McQuate and Prouty each made the decision to seek alternate employment.

On August 22, 2014, Ms. Wong and Messrs. McQuate and Prouty provided two weeks notice of their resignation. (SOF at 42.) In response to their notice, Wells Fargo terminated them, effective August 22, 2014. (*Id*. at 44.)

One week later, on August 29, 2014, Wells Fargo, through its counsel, sent letters to Ms. Wong and Messrs. McQuate and Prouty accusing them of soliciting a Wells Fargo client. (SOF 45.) The letters further stated that in order to avoid litigation, Ms. Wong and Messrs. McQuate and Prouty each needed to provide a response, in writing, stating that, among other things, they would not solicit or accept business from any of their former accounts prior to August 22, 2016. (*Id*.) Although the demand overstated the requirements set forth in their agreements, they each provided a response within the specified time frame confirming their intent to comply with the terms of their agreements. (*Id*. at 46.) Ms. Wong also included a letter from Cloud Peak Energy ("Cloud Peak"), the client Plaintiff's counsel claimed to have been solicited, in which Cloud Peak affirmatively stated that it had not been solicited. (*Id*. at 47.)

Despite Ms. Wong and Messrs. McQuate and Prouty's written assurances, two weeks later, on September 16, 2014, Wells Fargo initiated this action, alleging eight separate claims against them. (Compl.) Wells Fargo had filed similar actions in Colorado state court against other former employees in 2014. (*Id*. at 51.)

### III.    LEGAL STANDARD

Summary judgment is proper if the movant demonstrates that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When applying this standard, a district court views the factual record and draws all reasonable inferences in the light most

favorable to the non-movant.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim and any defenses become immaterial."  *Adler*, 144 F.3d at 670.  The non-movant may not rely on "'ignorance of facts, on speculation, or on suspicion' to avoid summary judgment."  *Lollis v. City of Eufaula*, 249 Fed. Appx. 20, 22 (10th Cir. 2007) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).  Further, the non-movant may not "create a genuine issue of material fact through unsubstantiated allegations."  *Id.* at 25.

## IV.   <u>CLAIMS AND DEFENSES UPON WHICH SUMMARY JUDGMENT IS SOUGHT</u>

### A.   Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's claim for breach of contract (claim one) as the contracts are void.

Wells Fargo claims that Ms. Wong and Messrs. McQuate and Prouty entered into agreements with Wells Fargo.  (Compl. ¶¶ 13, 16, 19.)  As set forth below, each of these agreements are void under Colorado law.

#### 1.   *All three agreements should be analyzed under Colorado law.*

Ms. Wong and Mr. Prouty's agreements, entitled "Wells Fargo Agreement Regarding Trade Secrets, Confidential Information, Non-Solicitation, and Assignment of Inventions," state that the agreements and any claims arising from them "shall be governed by the law of the state where the incident(s) giving rise to the dispute or claim arose."  (SOF 52.)  Since Mr. Prouty and Ms. Wong live and work in Colorado, there is no dispute that Colorado law applies to their agreements.  (Compl. ¶¶ 6-7.)

Mr. McQuate's Employment Agreement with Acordia of West Virginia, which is twenty years old, states that it should be interpreted and enforced in accordance with West Virginia law.

(SOF 56, 57.)  Under Colorado's choice of law rules, however, it is Colorado law that applies to the interpretation and enforcement of this agreement.

As this case was filed in Colorado, Colorado's choice of law rules are determinative.  *See Jacquat v. Hub Intern. Insurance. Servs., Inc.*, No. 09-cv-02539, 2010 WL 9568710 at *3 (D. Colo. June 15, 2010) ("The law of the forum state controls choice of law determinations.") (internal citations omitted).  Colorado has adopted the Restatement (Second) of Conflict of Laws § 187 for choice of law determinations.  *Id.*  This section provides that the law designated in a contract should be applied <u>unless</u> (1) the chosen state has no substantial relationship to the parties or the transaction and there is no reasonable basis for the parties' choice, *or* (2) application of the law of the chosen state would be contrary to a fundamental policy of a state that has a materially greater interest in the issue.  Restatement (Second) of Conflict of Laws § 187 (1971) (emphasis added).

West Virginia has no relationship to the parties or the contract at issue and its law should therefore not apply.  Neither Mr. McQuate nor Wells Fargo are citizens of West Virginia and the contract was not signed in West Virginia.  (Compl. ¶¶ 3-5); (SOF 58.)  Further, Colorado has a policy against non-compete agreements, which has been held to be fundamental.  *See Jacquat*, 2010 WL 9568710 at *4.  West Virginia has no similar policy.  To the contrary, under West Virginia law, "[a]n inherently reasonable restrictive covenant is *presumptively enforceable* in its entirety upon a showing by the employer that he has interests requiring protection from the employee."  *Wood v. Acordia of West Virginia, Inc.*, 618 S.E.2d 415, 421 (W. Va. 2005) (internal citations and quotations omitted) (emphasis added).  Application of West Virginia law to this issue would be contrary to a fundamental policy of Colorado.  *See Jacquat*, 2010 WL 9568710 at *5 (holding that Colorado law applied despite contract's provision for New Mexico law where "Colorado's default is that non-solicitation and non-compete provisions are invalid; [but] New

Mexico's default is that they are valid . . .").  As such, Colorado law should be applied to Mr. McQuate's agreement.

### 2.   Under Colorado law, the agreements at issue are void.

Under Colorado law, non-compete contracts are contrary to public policy and void except in a few narrowly-defined situations.   C.R.S. § 8-2-113(2); *see also Saturn Systems, Inc. v. Militaire*, 252 P. 3d 516, 526 (Colo. App. 2011) ("any agreement that restricts a person's right to receive compensation for work performed is void *ab initio* unless it fits one of the four statutory exceptions").  This general prohibition includes agreements not to solicit customers, such as the agreements at issue in this case.  *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007) ("an agreement not to solicit customers is a form of an agreement not to compete").

Colorado Revised Statute § 8-2-113(2) sets forth the four limited exceptions in which non-compete contracts are permissible:

(1) any contract for the purchase and sale of a business of the assets of a business;

(2) any contract for the protection of trade secrets;

(3) any contractual provision for recovery of the expense of educating and training an employee who has served an employer for a period of less than 2 years;

(4) executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

C.R.S. § 8-2-113(2).  Wells Fargo incorrectly argues that the second and fourth exceptions apply to this case.  (Pl.'s Mot. for Prelim. Inj. at p. 11, [Doc. # 5].)

### i.   The executive and management personnel exception is not applicable to the agreements at issue.

It is the employer's burden to establish that an employee fits within the executive and management exception.  *See Porter Indus. Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984).  In considering the applicability of the exception, courts should keep in mind "the public policy of

Colorado disfavoring covenants not to compete" and "the requirement that the exceptions under the statute be narrowly construed." *Phoenix Capital, Inc.* at 842-43 (internal citations omitted).

"The Colorado Supreme Court has not considered [the executive and management personnel] exception." *DISH Network Corp. v. Altomari*, 224 P.3d 362, 366 (Colo. App. 2009) (internal citations omitted). The Colorado Court of Appeals, however, has defined "management personnel" based on the ordinary dictionary definition of the words as "persons who conduct or supervise a business." *DISH Network Corp.* 224 P.3d at 366; *Alexander & Alexander, Inc. v. Frank B. Hall and Co., Inc.*, No. Civ. A. 88-A-1621, 1990 WL 8028 (D. Colo. Jan. 31, 1990) ("To be part of the group executive or management personnel, an employee must do more than transact business for the company; he must have significant responsibility for the business and act in a supervisory capacity.").

Factors that courts have considered in determining whether an employee fits within the executive and management personnel exception are: (1) job title, (2) specific job duties, (3) percentage of work in a sales role versus a management role, (4) number of employees supervised, (5) hiring and firing authority, and (6) number of levels between top executive and employee. *See, e.g., Cont'l Credit Corp v. Dragovich,* No. 13-cv-01349, 2013 WL 3303976 (D. Colo. July 1, 2013) (finding that while employee's title was "Regional Account Manager," he did *not* fit within the executive and management exception because his duties and responsibilities suggested he was a sales person and, while he did supervise two people, he had no hiring or firing authority); *DISH Network Corp.*, 224 P.3d at 365-66 (holding that "Commercial Director" was management because he directed, controlled and supervised fifty employees nationwide in a division of a business with a ten million dollar budget, was otherwise at the top of the compensation scheme, was employed in a decision-making capacity, and had a certain level of autonomy); *Alexander & Alexander, Inc.*,

1990 WL 8028 (holding that employee did *not* fit within the executive or management exception even though his title was "vice president" and he supervised six people because employee still reported to a managing vice president of which there were approximately fifty-five nationwide and employee was compensated on the "basis of personal production of new insurance business, not on the basis of alleged management responsibilities"); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789 (Colo. App. 2001) *abrogated on other grounds* (finding that executive and management personnel exception did *not* apply to employee who, for the last two years of his employment, did not supervise or manage anyone and had three levels of management employees above him); *Porter Indus. Inc.*, 680 P.2d 1339 (holding that employee was *not* management or executive personnel because his job title was company representative and salesperson, his job duties were to negotiate and sell contracts, makes sales calls, keep updated contracts filed, and promote the employer's business, and he did not act in an unsupervised capacity).

Despite Plaintiff's argument, neither Ms. Wong nor Messrs. McQuate and Prouty fit within the executive and management personnel exception.  None of them held a manager title and all of them reported to Mr. Jon Lindstrom, who is just one of approximately thirty managing directors at Wells Fargo.  (SOF at 13, 16, 22, 36, 37.)  There were at least three levels of management above Ms. Wong and Messrs. McQuate and Prouty.  (*Id*. at 38.)  Further, their job duties and responsibilities were primarily related to sales.  (*Id*. at 14, 17, 23.)  Neither Ms. Wong nor Messrs. McQuate and Prouty had hiring or firing authority.  (*Id*. at 15, 18, 24.)  Finally, although Wells Fargo claims that Ms. Wong and Messrs. McQuate and Prouty were supervisors of three employees, they did not have authority to determine the compensation of any employee, to transfer employees between departments, to promote employees, to suspend employees, or to discipline employees.  (*Id*.)  Moreover, the three employees they allegedly supervised actually reported to

Rita Nicholson.  (*Id*. at 39.)  Ms. Wong and Messrs. McQuate and Prouty simply gave them tasks.

(*Id*. at 40.)  Wells Fargo even admits that there were actually only three managers in the Denver

office, Mr. Lindstrom, Ms. Nicholson and Ms. Muller.  (*Id*. at 41.)  Accordingly, based on the

undisputed facts, the management personnel exception does not apply to the agreements at issue.

> ### ii. *The trade secret exception is not applicable to the agreements at issue.*

> #### a. *Wells Fargo has failed to establish trade secrets*

Under the Colorado Uniform Trade Secrets Act, a trade secret is defined as:

> …the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. ***To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.***

C.R.S. § 7-74-102(4) (emphasis added).  The essential test in Colorado to determine whether a

trade secret exists involves consideration of the following factors:

> (1) the extent to which the information is known outside the business;

> (2) the extent to which it is known to those inside the business, i.e., by the employees;

> (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

> (4) the savings effected and the value to the holder in having the information as against competitors;

> (5) the amount of effort or money expended in obtaining and developing the information; and

> (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Hertz v. Luzenac Grp*, 576 F.3d 1103, 1114 (10th Cir. 2009) (citing *Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (1990)).  Further, the alleged secret "must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *Colo. Supply Co., Inc.,* 797 P.2d at 1306.

Wells Fargo, at its 30(b)(6) deposition, identified the following categories of *client* information as its trade secrets:  the structure of clients' insurance program, carrier placements, renewal dates, deductibles, policy language, revenues, premium costs, and financial information from the client that would not otherwise be public.  (SOF 69.); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135 (10th Cir. 2007) ("The law is well settled that corporations have an affirmative duty to make available as many persons as necessary to give complete, knowledgeable, and binding answers on the corporation's behalf.") (internal citations and quotations omitted).  For each of these categories, however, Wells Fargo admitted that clients are not restricted in any way from sharing or disclosing the information in any manner.  (SOF 70.)

The U.S. Supreme Court has held that "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information… his property right is extinguished. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (cited by *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009)).  Further, the Tenth Circuit has held that in a situation where a company took no measures to prevent its clients from disseminating allegedly secret information and former employees could acquire the allegedly secret information simply by requesting it from the client, no trade secret existed.  *Id*.  For these same reasons, Wells Fargo's argument that its *clients'* information is somehow a trade secret of Wells Fargo must fail. Wells Fargo did not, and could not, take any precaution to prevent the clients from sharing the categories of information identified in the 30(b)(6) deposition, and clients are free to share the

information with whomever they wish, including Ms. Wong and Messrs. McQuate and Prouty. (SOF 70-72.)

Wells Fargo also identified, through its 30(b)(6) deposition, prospects and marketing presentations as trade secrets.  (SOF at 75.)  With respect to marketing, Wells Fargo again admits it takes no precautions to guard the secrecy of the information.  Indeed, clients are free to share Wells Fargo's marketing presentation with another brokerage group if they wish because the prospective clients do not sign any type of confidentiality agreement.  (*Id*. at 76.)  With respect to the identity of prospective mining companies, there are a finite number of mining companies in the market seeking insurance.  The identity of these companies is readily available through public sources.  For instance, Mr. McQuate testified that he identified prospects by consulting public sources such as the Colorado Mining Association or the National Mine Association and that the top one hundred mining companies can be obtained through a simple Google search.  (*Id*. at 77.)  Thus, there is no secrecy.

Accordingly, Wells Fargo has not established any trade secrets and the agreements at issue are not necessary for the protection of trade secrets.

### iii.    *Even if there were trade secrets at issue, which there are not, the agreements do not fit within the trade secret exception.*

Even if trade secrets did exist, which they did not, "[a] noncompetition clause designed to protect trade secrets must be narrowly drafted to fit into the statutory exception provided in C.R.S. § 8-2-113(2)(b)."  *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (D. Colo. 1988).  The purpose of the agreement must be to protect trade secrets and it must be reasonably limited in scope to the protection of trade secrets.  *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1133 (10th Cir. 2003).  As set forth below, the agreements at issue are not narrowly tailored to protect trade secrets and are therefore invalid non-compete agreements under C.R.S. § 8-2-113.

13

### a. None of the agreements are narrowly tailored for the protection of trade secrets.

The agreements at issue in this case are designed to keep Ms. Wong and Messrs. McQuate and Prouty from competing with Wells Fargo, not to protect any alleged trade secrets.  All of the agreements prohibit the employee from (1) soliciting Wells Fargo's clients and prospective clients and (2) soliciting or recruiting Wells Fargo's employees.  (*See* SOF 53, 61, 62.)  These are general prohibitions against competition and are not limited to the use of trade secrets.

If an agreement contains a covenant not to solicit customers, the "former employee needs to be free to solicit (actively or passively) former customers, as long as he or she does not use the employer's trade secrets to do so."  *Phoenix Capital, Inc.*, 176 P.3d at 844; *see also Jacquat,* 2010 WL 9568710 at * 6.  As set forth in that case:

> Under the agreement, Plaintiff may not 're-write or divert' a customer away from the Defendant even if the Plaintiff did so using public knowledge that was in no way obtained through the Plaintiff's employment with the Defendant.  Such a far-reaching restriction is beyond the trade secrets exception and is more akin to a generic non-compete agreement, which is void under Colorado law.

Further, allowing "a multi-purpose contract" to be valid by virtue of it containing one clause pertaining to trade secrets would "thwart the legislative intent of protecting employees from non-competition clauses except in carefully defined circumstances."  *Colorado Accounting Machs., Inc. v. Mergenthaler*, 609 P.2d 1125, 1126 (Colo. App. 1980).

With respect to Mr. Prouty and Ms. Wong's agreements, there is a section entitled "Trade Secrets and Confidential Information," and a separate section entitled "Non-Solicitation of the Company's Customers and Employees."  (SOF 53.)  The section addressing trade secrets prohibits employees from using, divulging, or disclosing the information described.  (*Id*. at 54.)  This is sufficient protection for Wells Fargo's alleged trade secrets.  The separate section prohibiting solicitation of customers does not mention trade secrets.  (*Id*. at 55.)  Thus, the separate "Non-

Solicitation of the Company's Customers and Employees" section is not for the protection of trade secrets and is an invalid non-compete agreement. *See, e.g., Nat'l Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo. App. 1984) (court has discretion to reform an unreasonable restriction in a non-compete agreement).

Mr. McQuate's alleged agreement is a ten page document entitled "Employment Agreement," which states it is effective as of January 1, 1995 and is between Mr. McQuate and Acordia of West Virginia, Inc. (SOF 56.) It only mentions the term "trade secret" once. (*Id*. at 60.) A factor courts have considered in analyzing whether an agreement is narrowly tailored to protect trade secrets is whether there are other provisions, such as job responsibilities or pay, in the agreement. *Haggard v. Synthes Spine,* No. 09-cv-00721, 2009 WL 1655030 at * 5 (D. Colo. June 12, 2009). Mr. McQuate's Agreement contains provisions concerning duties, compensation, confidentiality and restrictive covenants, expenses, collection of accounts receivable, employee benefits, vacation, and termination. (*Id* at 59.) Therefore, Wells Fargo cannot establish that the purpose of Mr. McQuate's agreement is for the protection of trade secrets as is required for the agreement to be valid under C.R.S. § 8-2-113.

### b. None of the agreements are reasonable in scope.

To be reasonable, a non-compete agreement must not be broader than necessary to protect the promisee's legitimate interests, and it must not impose hardship on the promisor. *Reed Mill & Lumber Co., Inc. v. Jensen*, 165 P.3d 733, 736 (Colo. App. 2006). Based on Wells Fargo's definition of the term "solicit," Ms. Wong and Messrs. McQuate and Prouty are prohibited from "any contact or communication" with their former clients "regardless of whether the client reaches out to the former employee or vice versa." (SOF 63.) Thus, Wells Fargo's agreements not only prevent Ms. Wong and Messrs. McQuate and Prouty from having any conversation with former clients, even of a personal nature, but they also prohibit clients from following them in response

to a personal loyalty if the client chooses to do so.  This prohibition goes beyond the scope of Wells Fargo's legitimate interests.  *See Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 493 (Colo. 1989) (noting that a limiting consideration in the scope of an agent's duty not to compete is "society's interest in fostering free and vigorous economic competition"); *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d at 793 (finding that non-solicitation clause of employment agreement that allegedly precluded employees from having any involvement at all in new employer's hiring process would be invalid restraint of trade under Colorado law).  Accordingly, all three Wells Fargo agreements are unreasonable in scope and invalid under C.R.S. § 8-2-113.

Moreover, Mr. McQuate's twenty-year old agreement states that he shall not "directly or indirectly, solicit, induce, recruit, or cause another person in the employ of Employer to terminate his or her employment for the purpose of joining, associating or becoming an employee with any business which is in competition with any business or activity engaged in by Employer."  (SOF 62.)  Prohibiting any indirect recruitment precludes individuals from making any favorable comment about his or her new employment to anyone who might convey the comment to an employee of the former employer.  *See Atmel Corp.*, 30 P.3d at 793 (interpreting a similar restriction).  This is an "absurd" result.  *Id.*   Thus, under its express terms, Mr. McQuate's agreement is overly broad and unreasonable.

Similarly, the covenant concerning clients and prospective clients in Mr. McQuate's Agreement is overly broad.  Mr. McQuate's agreement states that the employee shall not "either directly or indirectly, solicit, sell, service, create, manage, or implement any kind of service or product offered by Employer" to any company that was a client of the Employer at the time of termination, had been a client within two years of the termination, or who Employee called upon as a prospect within two years of termination.  (SOF 61.)  Covenants that prohibit employees from

contacting *any* clients of his or her former employer, such as this, without regard to whether the employee actually had contact with the client are overly broad.  *See, e.g., Mgmt. Recruiters of Boulder Inc.*, 762 P.2d at 766 (finding a covenant that prohibited employee from contacting any client he had *access* to during the previous twelve months to be overly broad and limiting the covenant to clients with whom employee had *actual contact*).

For all these reasons, even if trade secrets could be established by Wells Fargo, which is in no way conceded, the agreements at issue are overly broad, unreasonable, and not narrowly tailored for the protection of trade secrets.  As such, they do not fit within the trade secret exception and are void as against public policy.  *See* C.R.S. § 8-2-113.

**B.  Ms. Wong and Messrs. McQuate and Prouty are also entitled to summary judgment on Plaintiff's claim for breach of contract (claim one) as they have not breached their agreements.**

"[A] party attempting to recover on a claim for breach of contract must prove the following elements:  (1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff."  *W. Distrib. Co. v. Diodosio*, 841 P. 2d 1053, 1058 (Colo. 1992) (internal citations omitted).  As discussed above, Wells Fargo cannot prove the existence of a valid contract.  Even if the non-compete agreements are valid, however, which they are not, Ms. Wong and Messrs. McQuate and Prouty have *not* breached their agreements.

In its Verified Complaint, Wells Fargo claims that Ms. Wong and Messrs. McQuate and Prouty breached their agreements by (1) using and disclosing Wells Fargo's confidential information and trade secrets, (2) failing or refusing to return all documents to Wells Fargo, (3) soliciting their former accounts to leave Wells Fargo and (4) soliciting Wells Fargo employees to leave Wells Fargo and work for McGriff, Seibels, & Williams.  (Compl. ¶55.)  The record is devoid of evidence to support these allegations.

17

As set forth below, in the analysis of Wells Fargo's misappropriation of trade secrets claim, there is no evidence that Ms. Wong and Messrs. McQuate and Prouty used or disclosed any of Wells Fargo's information.  (SOF 85-88.)  Clients voluntarily provided their own information to them.  (*See, e.g.*, SOF 73.)

With respect to the alleged failure to return documents, Wells Fargo admits that it does not know if Ms. Wong and Messrs. McQuate and Prouty took documents and it has only a mere suspicion that such documents even existed. (SOF 93, 94.)  Further, each of the Defendants represented to Wells Fargo, when asked to do so by Wells Fargo's attorney, that they did not take any of Wells Fargo's property with them.  (SOF 46.)  There is no evidence that any of the Defendants took any Wells Fargo property.

Furthermore, under Colorado law, the term "solicit" means "to approach with a request or plea."  *Atmel Corp.*, 30 P.3d at 793.  The record is devoid of any evidence that Ms. Wong and Messrs. McQuate and Prouty approached either former accounts or Wells Fargo employees with requests or pleas.  To the contrary, Wells Fargo admits that it is not aware that they inappropriately solicited Wells Fargo employees. (SOF 80.)

With respect to customers, Wells Fargo admits that it does not have any information to support the claim made in its Verified Complaint that Target Drilling, a former customer, was solicited.  (Compl. ¶ 47); (SOF 81.)  Instead of basing its claims on evidence, Wells Fargo is suing for the loss of Target Drilling because it believes there is a "common theme" that other accounts have been solicited "so it's not a stretch to figure out that if another account goes to McGriff…something similar happened."  (*Id*. at 82.)  This type of *"post hoc* fallacy" is not sufficient to show any wrongdoing.  *See Am. Family Mut. Ins. Co. v. Gustafson*, No. 08-cv-02772, 2011 WL 782574 at *6 (D. Colo. Feb. 25, 2011) (holding that employer's suggestion that the

cancellation of policies by customers is proof that former employee used customer's information is a classic example of the "*post hoc* fallacy"). It is nothing more than speculation. *Id.* With respect to Cloud Peak the customer referenced in the Verified Complaint, the actual evidence shows that Cloud Peak made its own choice to switch brokers and was not solicited. (SOF 47-50.) Thus, there is no evidence that any of the Defendants breached their agreements and summary judgment should be granted in their favor on Plaintiff's breach of contract claim.

### C. Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's breach of the duty of loyalty claim (claim two).

In general, employees are under a duty of loyalty to act solely for the benefit of their employer in all matters connected with their employment. *See Jet Courier Serv., Inc.,* 771 P.2d at 493 (citing Rest. 2d of Agency § 387). "One facet of the duty of loyalty is an agent's duty not to compete with the principal concerning the subject matter of his agency. *Id.* (internal citations and quotations omitted). The scope of an employee's duty is limited, however, by "society's interest in fostering free and vigorous competition." *Id.* Thus, to establish a claim for breach of the duty of loyalty, a plaintiff must prove that an employee's actions constituted violations of the duty of loyalty rather than legally permissible preparations to compete. *Id.*

In its 30(b)(6) deposition, Wells Fargo stated that the factual basis for its duty of loyalty claim was the deletion of emails. (SOF 83.) There is no evidence that Defendants inappropriately deleted any emails. (*Id.* at 84.) Further, this is not referenced in the duty of loyalty claim in the Verified Complaint. In its Verified Complaint, Wells Fargo alleges that Ms. Wong and Messrs. McQuate and Prouty breached their duty of loyalty by recruiting each other to leave the employment of Wells Fargo, conspiring to "cripple" Wells Fargo's ability to retain the accounts up for renewal, and misappropriating Wells Fargo's confidential information and trade secrets. (Compl. ¶63.) None of these allegations are sufficient to establish a breach of the duty of loyalty.

Under the Uniform Trade Secrets Act ("UTSA"), preemption of common law claims is appropriate when the common law claims are based on the same operative facts as a claim for misappropriation of trade secrets. *See, e.g., Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996). Thus, Wells Fargo's allegation that the alleged misappropriation of trade secrets somehow supports its claim for breach of the duty of loyalty should be ignored.

In matters concerning conversations with co-workers, an employee may breach his or her duty of loyalty to an employer, if during his or her employment, the employee solicits other employees to terminate their employment. *Jet Courier Serv., Inc.,* 771 P.2d at 495. Wells Fargo has admitted that it is not aware that Ms. Wong or Messrs. McQuate and Prouty inappropriately solicited Wells Fargo employees. (SOF 80.)

Moreover, employees have a legal privilege that entitles them to make career preparations for after their departure from their employer. *In re Prof'l Home Health Care, Inc.*, 159 Fed. Appx. 32, 35 (10th Cir. 2005). In fact, the Supreme Court of Colorado has held that "certain traditional actions taken by departing employees (e.g., an executive leaving with a secretary, a mechanic leaving with an apprentice, a firm partner leaving with associates) are not considered sufficient to constitute a breach of the duty of loyalty, absent an intent to injure the employer." *Id.* at 34 (*citing Jet Courier, Inc.*, 771 P.2d at 497, n. 13.) In this case, there is no evidence that Ms. Wong or Messrs. McQuate and Prouty had an intent to injure Wells Fargo through their departure. Rather, due to their declining work environment, they decided, independently of each other, to seek alternate opportunities. *See In re Prof'l Home Health Care, Inc.*, 159 Fed. Appx. at 35 (holding that an employee's motive for leaving is relevant to the duty of loyalty analysis). Additionally, contrary to Wells Fargo's allegation that their departure was planned at a time designed to "cripple" Wells Fargo, Ms. Wong and Messrs. McQuate and Prouty each offered to continue

working for the customary two weeks.  (SOF 42).  It was Wells Fargo's decision to terminate their

employment effective immediately.  (*Id*. at 44.)  Finally, there is no evidence that Ms. Wong or

Messrs. McQuate and Prouty offered or promised each other anything as an inducement for them

to leave.

### D. Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's misappropriation of trade secrets claim (claim three).

To succeed on a misappropriation of trade secrets claim, a plaintiff must show:  (1) he

possessed a valid trade secret; (2) the trade secret was used or disclosed without consent; and (3)

the defendant knew or should have known that the trade secret was acquired by improper means.

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993).  As explained

above, the information Ms. Wong and Messrs. McQuate and Prouty had access to while at Wells

Fargo belongs to the clients and does not constitute "trade secrets."  Even if trade secrets did exist,

however, there is no evidence in the record to support a claim of misappropriation.

Under the UTSA, misappropriation is defined as "disclosure or use of a trade secret of

another without express or implied consent by a person who . . . at the time of disclosure or use,

knew or had reason to know that his knowledge of the trade secret was . . . acquired under

circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ."  C.R.S. § 7-74-

102(2).  To succeed on this claim, Wells Fargo must prove that Ms. Wong and Messrs. McQuate

and Prouty used or disclosed its trade secrets.  *See, e.g., Ciena Comm'ns, Inc. v. Nachazel,* No. 09-

cv-02845, 2010 WL 3489915 at *4 (D. Colo. Aug. 31, 2010) (defining misappropriation as

"'acquisition,' 'disclosure,' or 'use' of a trade secret that was obtained through improper means.")

There is no evidence in the record that Ms. Wong or Messrs. McQuate and Prouty have

used or disclosed Wells Fargo's trade secrets or confidential information.  They have not had

access to any of Wells Fargo's information since the termination of their employment.  (SOF 86);

*see Mentor Worldwide LLC v. Craigo*, No. 12-cv-00776, 2012 WL 1439498 at * 4 (D. Colo. Apr. 26, 2012) (finding insufficient evidence to show employee was using former employer's trade secrets based in part on fact that employee no longer had access to information).  Further, there is no evidence that any of the Defendants took any Wells Fargo property with them.  (SOF 46, 85, 86); s*ee Cargill Inc. v. Kuan*, No. 14-cv-2325, 2014 WL 5336233 at *5 (D. Colo. Oct. 20, 2014) (finding no evidence of misappropriation based in part on fact that employee returned all of his former employer's information).  In fact, McGriff, Seibels, & Williams, the Defendants' new employer, testified that it instructed Defendants to not to take anything with them when they left Wells Fargo and to respect Wells Fargo's confidential information.  (SOF 43); *Mentor Worldwide LLC*, 2012 WL 1439498 at * 4 (finding fact that new employer instructed employee not to use any information obtained while working at former employer as evidence that no misappropriation of trade secrets occurred).  Finally, Wells Fargo admits that (1) it does not know how Ms. Wong and Messrs. McQuate and Prouty misappropriated its alleged trade secrets, (2) does not know if they disclosed its alleged trade secrets at all, and (3) does not have any information that they actually used its alleged trade secrets when speaking to the clients who were allegedly solicited.  (SOF at 85, 87, 88.)

In support of its claims, because there is no direct evidence, Wells Fargo is relying on inferences based on the timing of customers switching brokers.  The mere cancellation of policies by customers soon after an employee's departure is not sufficient to establish misappropriation of trade secrets.  *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *6.  As Wells Fargo admits, customers change brokers for any number of reasons.  (SOF 89); *see also Am. Family Mut. Ins. Co.*, 2011 WL 782574 at * 6 (noting that customers may cancel their policies for a number of reasons including that the customer learned of a broker's switch to a new employer and reached

out to the broker out of a personal loyalty.)  Accordingly, Wells Fargo's inferences and suspicions are insufficient to prove misappropriation.

There is no evidence of threatened disclosure either.  To establish a claim of "threatened disclosure" under the UTSA, a plaintiff must "show that the former employee has more than a generalized knowledge of the trade secrets."  *Cargill Inc.*, 2014 WL 5336233 at * 6.  In *Cargill Inc.*, this court, having found no evidence of "actual" misappropriation, considered whether there was sufficient evidence of "threatened disclosure" to support a preliminary injunction.  *Id.*  This Court found that there was insufficient evidence to support a finding of "threatened misappropriation," based on the fact that (1) there was no source for the former employee to retrieve trade secrets other than what he or she could recall, (2) there was no evidence establishing what, if anything, the former employee could recall, and (3) the employer's president could not recall specific trade secrets minutes after reviewing documents.  While the former employee once had specific knowledge of employer's trade secrets, the employee's knowledge had now become generalized.  *Id.*

Here, Wells Fargo similarly admits that Ms. Wong and Messrs. McQuate and Prouty have not had access to any of Wells Fargo's trade secrets since the termination of their employment.  (SOF 86.)  Additionally, Wells Fargo has produced over 1,700 pages of client information that it claims to be "representative samples" of its trade secrets.  (*Id.* at 67, 68.)  To claim that Ms. Wong and Messrs. McQuate and Prouty memorized all of this information is non-sensical, particularly when Wells Fargo has admitted that it cannot recall information pertaining to the accounts managed and produced by Ms. Wong and Messrs. McQuate and Prouty, without document assistance.  (*Id.* at 79.)  Similar to *Cargill Inc.*, there is insufficient evidence in this case to support

a finding of "threatened misappropriation," and summary judgment in favor of Ms. Wong and Messrs. McQuate and Prouty is appropriate on this claim.

### E.  Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's claim for unfair competition (claim four).

To state a viable claim for unfair competition, a plaintiff must prove that (1) defendant "either copied [plaintiff's] products or services or misappropriated [plaintiff's] name or operations in some regard, and (2) that [defendant's] conduct is likely to deceive the public because of its difficulties in distinguishing between [plaintiff's and defendant's] products and services."  *L-3 Comm'ns Corp. v. Jaxon Eng'g & Maint. Inc.*, 2013 WL 1231908 at * 8 (D. Colo. 2013).  The tort of unfair competition in Colorado only reaches conduct that "involves either using or copying a plaintiff's products or services and deceiving or confusing the public as to the source of the business in question."  *NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1133 (D. Colo. 2007).  Unfair competition has *not* been expanded to include any allegedly improper conduct by a competitor. *Id.* at 1133.  There is no evidence in the record, or even an allegation in the Verified Complaint, that Ms. Wong and Messrs. McQuate and Prouty used or copied Wells Fargo's products. Moreover, there is no evidence that the public has been deceived by their actions.

Wells Fargo claims that the basis for its unfair competition claim is that it has been told by former clients that Ms. Wong and Messrs. McQuate and Prouty have made misrepresentations concerning Wells Fargo's mining business.  (SOF 90.)  Even if this were sufficient to establish an unfair competition claim, which it is not, Wells Fargo has no firsthand knowledge of any such misrepresentations.  (*Id.* at 91.)  The only support Wells Fargo claims to have for its unfair competition claim is inadmissible hearsay.  *See People v. Hernandez and Assoc., Inc.*, 736 P.2d 1238, 1240 (Colo. App. 1986) (holding that affidavits based upon inadmissible hearsay are insufficient to support summary judgment).  Further, Mr. Prouty specifically testified that he never

told anyone nor heard anyone else state that Wells Fargo was getting out of the mining business or that Wells Fargo lacked expertise in the mining business.  (SOF 92.)  Accordingly, Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on this claim.

**F.   Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's claim for conversion (claim five).**

To state a claim for conversion, a plaintiff must prove that:  (1) the defendant exercised dominion or control over property; (2) the property belonged to the plaintiff; (3) the defendant's exercise of control was unauthorized; (4) plaintiff demanded return of the property; and (5) the defendant refused to return the property.  *L-3 Comm'ns Corp. v. Jaxon Engineering & Maintenance, Inc.*, 863 F. Supp.2d 1066, 1081 (D. Colo. 2012).  This claim fails for two reasons: (1) there is no factual support for Wells Fargo conversion claim and (2) it is preempted by the UTSA.  *See* C.R.S. § 7-74-108.

*a.   Wells Fargo's Factual Support is Insufficient to Prove Conversion.*

Wells Fargo's alleged support for its conversion claim is (1) Wells Fargo's belief that the Molycorp account was set up to fail since, while employed at Wells Fargo, Ms. Wong and Messrs. McQuate and Prouty told Molycorp that Wells Fargo did not have anyone in Denver to work on the account and (2) Wells Fargo's suspicion that files are missing.  (SOF 95.)  The first basis must be ignored as it does not relate to the exercise or control over property and therefore cannot support a claim for conversion.

With respect to the alleged second basis, a suspicion that files are missing, Wells Fargo must establish its conversion claim by a preponderance of the evidence in order to succeed.  C.R.S. § 13-25-127.  Wells Fargo's reliance on mere suspicion is not sufficient.  *See Lollis v. City of Eufaula*, 249 Fed. Appx. at 22 (holding that non-movant may not rely on "'ignorance of facts, on

speculation, or on suspicion' to avoid summary judgment") (internal citations and quotations omitted).

Further, Wells Fargo admits that it does not know if the information it alleged in its Verified Complaint that Ms. Wong and Messrs. McQuate and Prouty allegedly failed to return even existed. (SOF 94.)  Thus, there is no evidence in the record to establish that any of the Defendants converted any specific property.  *See L-3 Comm'ns Corp.*, 863 F. Supp. 2d at 1082 (holding that a defendant may properly seek summary judgment on a conversion claim, if, at the close of discovery, the plaintiff is unable to make a plausible factual showing that the defendant converted any of plaintiff's physical property).  As discovery has closed and Wells Fargo cannot make a plausible factual showing  to support its conversion claim, Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on the claim.

### b. Alternatively, Plaintiff's conversion claim is preempted as a matter of law by the UTSA.

Under the UTSA, a misappropriation of trade secrets claim "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies."  C.R.S. § 7-74-108.  "[T]he salient question in addressing the question of trade secrets act preemption is whether a challenged common law claim depends solely on a finding of trade secret status to be actionable."  *Virtual Cloud Serv. Inc.*, *v. CH2M Hill, Inc.*, No. 02-cv-01004, 2006 WL 446077 at *2 (D. Colo. Feb. 21, 2006); *see also Powell Prods., Inc.*, 948 F. Supp. at 1474 (holding that preemption under UTSA is appropriate when the "other claims are not more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation.") (internal citations and quotations omitted).  The information allegedly converted in this case is Wells Fargo's alleged confidential information and trade secrets.  Based on Wells Fargo's definition, confidential information is information belonging to the customer, not to Wells Fargo.  (SOF 64.)

Therefore, the only way for Wells Fargo to have the necessary property interest in the intellectual property it claims was taken by Ms. Wong and Messrs. McQuate and Prouty is for the information to qualify as a protectable trade secret. *See Virtual Cloud Serv. Inc.*, 2006 WL 446077 at *4 (holding that ownership rights only existed if the software at issue constituted a trade secret and therefore plaintiff's conversion claim was preempted under the UTSA). Given that Wells Fargo's conversion claim depends on its ability to establish the existence of a trade secret, it is preempted by the UTSA and Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment. *Id.*

### G. Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's claims for tortious interference with prospective business advantage and intentional interference with contractual relationships (claims six and seven).

To succeed on a claim for tortious interference with prospective business advantage, a plaintiff must prove, (1) "that [employee] induced a third person not to enter into or continue a contractual relationship with [employer]; (2) that [employee] did so intentionally; and (3) that [employee] used improper means to do so." *L-3 Comm'ns Corp.*, 2013 WL 1231908 at * 5 (D. Colo. 2013). A claim for intentional interference with contractual relationships is essentially the same except that an existing contract is required instead of a prospective contractual relationship. *See, e.g., Dawson v. Goldman Sachs & Co.*, No. 13-cv-02030, 2014 WL 5465127 at * 4 (D. Colo. Oct. 27, 2014). Both claims require intentional and improper conduct. *Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121, 1128 (D. Colo. 2000). A defendant does not engage in improper conduct, if (1) the conduct concerns a matter of competition between the defendant and plaintiff; (2) the defendant does not employ wrongful means; (3) the action does not amount to an unlawful restraint of trade; and (4) the defendant's purpose is, at least in part, to advance its own interests. *Id.* at 1129. As explained above, Ms. Wong and Messrs. McQuate and Prouty have not employed

any wrongful means.   They have not solicited Wells Fargo's customers or employees or misappropriated Wells Fargo's trade secrets or confidential information.   As such, summary judgment is appropriate on both of these claims.

Additionally, there is no evidence that Ms. Wong and Messrs. McQuate and Prouty have interfered with any contractual relationships.  *See, e.g., Am. Exp. Fin. Advisors v. Topel*, 38 F. Supp. 2d 1233, 1241 (D. Colo. 1999) (holding that plaintiff must prove the existence of a contract between the plaintiff and a third party to establish a claim for intentional interference with contractual relationships).   There is no other evidence of contracts that existed between Wells Fargo and its clients.   Wells Fargo only "believes" that it had a fee agreement with Cloud Peak and does not know if Cloud Peak performed on the contract.  (SOF 96.)

To the extent Wells Fargo is claiming that Ms. Wong and Messrs. McQuate and Prouty interfered with each other's non-compete agreements, as explained above, these contracts are not valid.  Even if they are, however, Ms. Wong and Messrs. McQuate and Prouty have complied with the terms.   They are accordingly entitled to summary judgment on Wells Fargo's seventh claim, intentional interference with contractual relationships, for this reason as well.

## H.  Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's claim for civil conspiracy (claim eight).

To establish a claim for civil conspiracy, a plaintiff must prove:  "(1) two or more persons…; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  *Jet Courier Serv., Inc.*, 771 P.2d at 502.  Further, conspiracy is a derivative cause of action.  *Double Oak Const., LLC v. Cornerstone Dev. Int'l., LLC*, 97 P.3d 140, 146 (Colo. App. 2003).  "If the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself."  *Id*.   The overt acts alleged to support Wells Fargo's civil

conspiracy claim are the same as those discussed above.  As there is insufficient evidence to establish any of these acts, Ms. Wong and Messrs. McQuate and Prouty are entitled to summary judgment on Wells Fargo's civil conspiracy claim as well.

## IV.   CONCLUSION

The record is devoid of evidence to support Wells Fargo's claims against these individual Defendants.  They have not engaged in any wrongdoing and Wells Fargo has failed to establish a legal right to restrict these individuals in their legitimate employment goals.

Accordingly, Ms. Wong and Messrs. McQuate and Prouty respectfully request that the Court enter judgment on all of Wells Fargo's claims in their favor and award such further relief as the Court deems just.

Dated:   May 29, 2015.

Respectfully submitted,

*s/ Amy L. Miletich*
Amy L. Miletich
MiletichCohen PC
1660 Wynkoop, Suite 1160
Denver, Colorado 80202
Telephone: (303) 825-5500
Email: amiletich@mcpclaw.com
*Counsel for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of May, 2015, I electronically filed the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send electronic notification of this filing to:


Mr. Timothy M. Kratz
Christopher T. Patrick
Jackson Lewis P.C.
950 17th Street, Suite 2600
Denver, Colorado 80202
Tim.Kratz@jacksonlewis.com
Christopher.Patrick@jacksonlewis.com

Mr. Peter R. Bulmer
Jackson Lewis P.C.
150 North Michigan Ave., Suite 2500
Chicago, Illinois 60601
bulmerp@jacksonlewis.com


By:   <u>/s/Amy L. Miletich</u>
Amy L. Miletich
MiletichCohen PC
1660 Wynkoop - Suite 1160
Denver, CO  80202
AMiletich@mcpclaw.com
(303) 825-5500
(303) 515-6655 (fax)
*Counsel for Defendants*