IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-2565-RM-MJW

WELLS FARGO INSURANCE SERVICES USA, INC.,

             Plaintiff,

v.

GLENN W. MCQUATE,
PAUL PROUTY, and
MARY WONG

             Defendants.

_____

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON ALL COUNTERCLAIMS**

_____

Defendants Glenn McQuate, Paul Prouty, and Mary Wong, by their undersigned counsel

and in accordance with Federal Rule of Civil Procedure 56, respectfully submit this response in

opposition to Plaintiff Wells Fargo Insurance Services USA, Inc.'s ("Plaintiff" or "Wells Fargo")

request for summary judgment on Defendants' counterclaims.

## I.   <u>INTRODUCTION</u>

Each of the Defendants had extensive and unique experience and relationships in the

mining insurance industry prior to working for Wells Fargo.  Wells Fargo hired them to assist

mining companies in the procurement and placement of their insurance coverage.  When their

work environment deteriorated and Wells Fargo management was unresponsive to their concerns,

Ms. Wong and Messrs. McQuate and Prouty left Wells Fargo to work for another insurance

services company.  In response, Wells Fargo immediately threatened them, demanding that they

not compete against it, and demanding that they provide assurances that exceeded Wells Fargo's

rights under the law.  Because they had done nothing wrong and hoped to avoid litigation, Ms.

Wong and Messrs. McQuate and Prouty cooperated and provided Wells Fargo with its requested assurances.  Immediately thereafter, however, Wells Fargo sued them.

This action was initiated by Wells Fargo last September when it filed an extensive complaint against these individuals claiming it was attempting to protect trade secrets and alleging that the Defendants were management personnel.  In a further attempt to intimidate the Defendants, Wells Fargo also filed a motion for expedited discovery and a motion for preliminary injunction. After hearing, Wells Fargo's request for expedited discovery was denied.  Wells Fargo later vacated its preliminary injunction hearing on December 1, 2014, less than three weeks before it was to occur.

In response to Wells Fargo's Complaint, Defendants asserted counterclaims of bad faith under the Colorado Uniform Trade Secrets Act, tortious interference with prospective business relationships, and abuse of process.  After the close of discovery, Defendants filed a Motion for Summary Judgment on all of Wells Fargo's claims.  Wells Fargo similarly filed a Motion for Summary Judgment on Defendants' counterclaims.

Wells Fargo's Motion for Summary Judgment on Defendants' counterclaims should be denied.  Wells Fargo attempts to thwart a focus on its true motive for this lawsuit.  Wells Fargo contends that Defendants cannot prevail even if Wells Fargo's subjective belief that trade secrets were threatened was insufficient, and it may have harbored an improper purpose motivating this lawsuit.  The undisputed facts reveal that Wells Fargo did not act in good faith in suing the Defendants and its conduct, despite whatever subjective motive Wells Fargo would now, in hindsight, like to ascribe to it, speaks for itself.

Wells Fargo's alleged belief, if true, that it possesses legitimate trade secrets, despite objective facts to the contrary, cannot provide the basis that it is entitled to summary judgment on

Defendants' counterclaims.  If this were the law, then any motion for summary judgment on similar claims would be readily granted.  Instead, Wells Fargo focuses its discussion on otherwise innocent conduct of the Defendants.  That Defendants resigned at the same time is not a crime.  It is not a legal offense that they were contacted by third parties with whom they had long worked or known.  That they were using skills acquired after many year in their profession, predating their employment at Wells Fargo, is not illegal.

Wells Fargo's ulterior purpose for initiating this lawsuit is in reaction to losing business to a competitor and to strongly forewarn other Wells Fargo employees to not contemplate leaving their employment with Wells Fargo with any hope of practicing their same occupation in competition with Wells Fargo.  Wells Fargo's distortion of the law and its abuse of the judicial process to unlawfully prevent competition under the thin guise of its alleged belief should not be sanctioned.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when the moving party shows there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law." *Carpio v. Stone Webster Constr, Inc.*, No. 12-cv-00185-RM-KLM, 2015 WL 3475660 at *2 (D. Colo. June 1, 2015).  When applying this standard, a district court views the factual record and draws all reasonable inferences in the light most favorable to the non-movant.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.   CLAIMS AND DEFENSES UPON WHICH SUMMARY JUDGMENT IS SOUGHT

**A. Summary judgment is not appropriate on Ms. Wong and Messrs. McQuate and Prouty's claims for bad faith under the Uniform Trade Secrets Act.**

**1. There is nothing prohibiting a substantive claim for attorney fees under the Uniform Trade Secrets Act.**

Under the Uniform Trade Secrets Act ("UTSA"), attorney fees may be awarded if a claim of misappropriation is brought in bad faith. C.R.S. § 7-74-105. Wells Fargo argues that the UTSA does not create a cause of action for attorney fees. [Dkt. #58, p. 3] It has not cited, however, any authority prohibiting counterclaims for attorney fees under the UTSA or requiring that such claims are to only be brought post-judgment. [*Id.*] Further, at least one court has allowed a counterclaim for bad faith under the UTSA. *See, e.g., Tel. Mgmt. Corp. v. Gillette*, No. CV 99-1338-KI, 2001 WL 210179 at *1 (D. Or. Feb. 20, 2001). Thus, despite its argument, Wells Fargo is not entitled to judgment on Ms. Wong and Messrs. McQuate and Prouty's counterclaims as a matter of law. If, however, the Court determines that the claim is more appropriately determined as post trial relief, Ms. Wong and Messrs. McQuate and Prouty respectfully request the right to file a post-judgment motion under C.R.S. § 7-74-105.

**2. The evidence supports a finding that Wells Fargo's claim of misappropriation of trade secrets was made in bad faith.**

Wells Fargo argues that Defendants, in order to establish a claim for bad faith under the UTSA, "must prove Wells Fargo brought its misappropriation claim **solely** for an improper purpose **and** that Wells Fargo did not subjectively believe it had [trade secrets] that had been, or [were] at risk of being, misappropriated." [Dkt. #58, p. 4] In support of this assertion, Wells Fargo relies upon legal authority analyzing abuse of process claims, not bad faith claims. [*See id.* (cases cited by Wells Fargo).]

A bad faith claim "generally consists of conduct that is arbitrary, vexatious, abusive, or stubbornly litigious, and may also include conduct aimed at unwarranted delay or disrespectful of truth and accuracy." *Hertz v. Luzenac America, Inc.*, 04-cv-01961-LTB-CBS, 2007 WL 135614 at * 1 (D. Colo. Jan. 16, 2007) (internal citations and quotations omitted) (reversed and remanded on separate grounds by 576 F.3d 1103 (10th Cir. 2009). Additionally, willful disregard of the law or persistence in pursuing a claim despite knowledge of a lack of admissible evidence to support the claim can establish vexatious behavior and bad faith. *See Consumer Crusade, Inc. v. Clarion Mortg. Capital, Inc.*, 197 P.3d 285, 291 (Colo. App. 2008); *Mayberry v. Univ. of Colo. Health Scs. Ctr.*, 737 P.2d 427, 430 (Colo. App. 1987).

California has adopted language identical to Colorado's in authorizing attorney fees for bad faith claims of misappropriation under the UTSA. Cal. Civ. Code § 3426.4. Applying this statute, California courts have found that a misappropriation claim was brought in bad faith in each of the following circumstances: (1) where the plaintiff knew or should have known that the allegedly secret information was available publicly, (2) where the plaintiff was unable to produce any evidence of trade secret misappropriation, and (3) where it was clear that the alleged misappropriation had not injured the plaintiff. *See, e.g., FAS Tech., Ltd v. Dainippon Screen Mfg., Co., Ltd.*, No. C 00-01879-CRB, 2001 WL 1159776 at*2-5 (N.D. Cal. Sept. 21, 2001); *see also Computer Econ., Inc. v. Gartner Group, Inc.*, No. 98-cv-0312 TW (CGA), 1999 WL 33178020 at *6 (S.D. Cal. Dec. 14, 1999).

Wells Fargo claims that it "believes it has confidential, non-public, proprietary information" that includes "insurance coverages, structures, objectives, expiration and renewal data, types of policies, revenues (commissions or fees) associated with each insurance policy, and expertise and advice related to comprehensive and strategic insurance coverage for clients and

prospective clients." [Dkt. #58, p. 4.]   Wells Fargo also claims Ms. Wong and Messrs. McQuate and Prouty misappropriated this information.

As Wells Fargo's Rule 30(b)(6) representative, Mr. Jon Lindstrom admitted that much, if not all, of this information is shared with insured clients and insurance companies.  (Defendants' Response to Statement of Undisputed Material Facts and Additional Facts ("Resp. to SOF") at 1, 2.)   The clients and insurance companies are not restricted from utilizing and disclosing the information, as they want.  *Id*.   Indeed, the information actually belongs to the insured client. Accordingly, a reasonable jury could determine that Wells Fargo knew or should have known that certain of the information it claims as trade secrets was not confidential and was available publicly. Such information, by definition, cannot be a trade secret.  *See* C.R.S. § 7-74-102(4) ("To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.")  A jury could reasonably conclude that Wells Fargo's misappropriation claim was brought in bad faith.

Wells Fargo also claims that it had a reasonable belief that Ms. Wong and Messrs. McQuate and Prouty were using Wells Fargo's trade secrets to target Cloud Peak Energy, Target Drilling, and potentially other Wells Fargo clients.  (Dkt. #58, p. 5-6).  The only bases given for this alleged belief, however, is (1) unidentified client information that was allegedly missing and (2) the fact that Cloud Peak Energy and Target Drilling moved their accounts shortly after Ms. Wong and Messrs. McQuate and Prouty resigned.  (*Id*.)  During discovery, and now after its closure, Wells Fargo cites to no specific evidence in support of its allegation of missing client information.

Moreover, the fact that a client changes its broker is not evidence of misappropriation. Clients may, and do, change brokers for any number of reasons.  *American Family Mut. Ins. Co.*

*v. Gustafson*, No. 08-cv-02772, 2011 WL 782574-MSK at *6 (D. Colo. Feb. 25, 2011) (denying employer's argument that the cancellation of policies by customers is proof that a former employee used employer's information).  In continuing to pursue its misappropriation claim given this unsupportable basis, Wells Fargo has disregarded the facts and the law.

Additionally, there is no evidence that Ms. Wong and Messrs. McQuate and Prouty misappropriated any alleged trade secrets.  Wells Fargo has admitted that (1) it does not know how Ms. Wong and Messrs. McQuate and Prouty misappropriated its alleged trade secrets, (2) does not know if they disclosed its alleged trade secrets at all, and (3) does not have any information that they actually used its alleged trade secrets when speaking to the clients who were allegedly solicited.  (Resp. to SOF at 48, 49, 50.) Given these admissions, a reasonable jury could find that Wells Fargo has willfully disregarded the law and facts and inappropriately continued to litigate its misappropriation claim to prevent the Defendants from competing against it, despite the lack of admissible evidence to establish the same.  Accordingly, Wells Fargo is not entitled to summary judgment on Ms. Wong and Messrs. McQuate and Prouty's claims for bad faith under the UTSA.

### B.  Wells Fargo is not entitled to summary judgment on Ms. Wong and Messrs. McQuate and Prouty's claims for abuse of process.

The tort of abuse of process is defined generally as "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed…." *LPS Prop. Tax Solutions, Inc. v. Workplace Tech., LLC*, No. 11-cv-01571-WYD-KMT, 2011 WL 5419721 at *2 (D. Colo. Nov. 9, 2011) (citing Restatement (Second) of Torts § 682 (1977)).  Under Colorado law, an abuse of process claim requires "(1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in the regular course of the proceedings, *i.e.,* use of a legal proceeding in an improper manner; and (3) resulting damage." *Lauren Corp. v. Century Geophysical Corp.*, 953 P.2d 200, 202 (Colo. App. 1998).  The

second element may be met by a showing of "sham litigation."  *Mrs. Colorado-America, Inc. v. Mrs. Colorado U.S. Pageant*, No. 05-cv-02660-MSK-MEH, 2007 WL 496690 at * 2 (D. Colo. Feb. 13, 2007).  A party can meet the second element of an abuse of process claim by establishing that the claims asserted against him or her are devoid of reasonable factual or legal support.  *Id.*

### 1. A reasonable jury could find that Wells Fargo had an ulterior purpose for initiating this action.

"An ulterior purpose is one that the legal proceeding was not designed to accomplish." *Gustafson v. American Family Mut. Ins. Co.*, 901 F.Supp.2d 1289, 1305 (D. Colo. 2012).  In proceeding with this lawsuit, despite having no valid legal or factual basis to do so, Wells Fargo succeeded in deterring Defendants from properly competing against it.  A reasonable jury could also find that another purpose of Wells Fargo in proceeding with this litigation against Defendants, is to scare its other employees from leaving or competing with Wells Fargo.  Indeed, fear of the reputational and financial costs of litigation would deter most persons.

The Denver office of Wells Fargo has a history of threatening and suing former employees. When Ms. Wong and Messrs. McQuate and Prouty worked at Wells Fargo, the Denver office had approximately thirty-five employees.  (Resp. to SOF at 51.)  In 2014, in addition to this lawsuit, the Denver office initiated two other lawsuits in Colorado state courts against three former employees.  (*Id.* at 52.)  Those cases were quickly resolved.  (*Id.* at 53.)  Further, the Denver office sent "cease and desist letters" to four additional former employees.  (*Id.* at 54).  In 2014 alone, the Denver office of Wells Fargo threatened or initiated litigation against nearly thirty percent of its employees.  Based on this information, a reasonable jury could determine that Wells Fargo's ulterior purpose for initiating this lawsuit was to harm the reputations of those employees who want to leave and to deter those employees from leaving.

Additionally, Wells Fargo has continually attempted to involve Ms. Wong and Messrs. McQuate and Prouty's current employer, McGriff, Seibels & Williams, Inc. ("McGriff") in what appears to be an attempt to influence their current employment and to deter McGriff from rightfully competing against Wells Fargo.  On August 29, 2014, Wells Fargo sent a letter to Ms. Wong and Messrs. McQuate and Prouty threatening litigation and requiring each of them to respond with a written statement if they wished to avoid litigation. (Resp. at SOF at 55.)  The Executive Vice President of McGriff, Mr. David Hobbs, was copied on this correspondence.  (*Id.* at 56.)  A reasonable jury could conclude that a purpose of proceeding with this lawsuit and involving Defendants' current employer was to harm the Defendants' reputations in the eyes of their new employer, to potentially interfere with their employment, and to prevent or deter McGriff from competing against it.

Finally, improper motive may be inferred from wrongful use of the process.  *Gustafson*, 901 F. Supp.2d at 1305 (internal citations omitted).  As set forth below, because Wells Fargo's claims are devoid of reasonable factual and legal support, a reasonable jury could conclude that the legal process has been improperly utilized.

### 2. A reasonable jury could find that Wells Fargo has improperly used the legal process during the course of these proceedings.

"An improper use of the legal process occurs when a particular procedural tool is used in an attempt to accomplish a result which that tool, when properly used, could not provide." *Gustafson*, 901 F. Supp.2d at 1305.  This has occurred here.

Wells Fargo initiated this action on September 16, 2014.  It requested expedited discovery, which request was denied by the Court, and a Preliminary Injunction.  [Dkt. #5, 6, 20.]  A hearing on Wells Fargo's Motion for Preliminary Injunction was scheduled for December 19, 2014.  [Dkt. #25.]  On December 1, 2014, after conducting written discovery only, Wells Fargo withdrew its

Motion for a Preliminary Injunction, claiming that the threat of irreparable harm appeared to have passed since renewal dates for many of the client accounts at issue had passed and Ms. Wong and Messrs. McQuate and Prouty had represented that they would not solicit Wells Fargo's clients. [Dkt. #39.]  The representations by Ms. Wong and Messrs. McQuate and Prouty, however, had actually been made directly to Wells Fargo's counsel, prior to the initiation of the lawsuit.  [Dkt. #1-8, 1-9, 1-10.]  In the intervening time period, Defendants expended extensive time and resources preparing for the Preliminary Injunction hearing.  Also during this time period, Wells Fargo had been unable, despite numerous requests for the production and identity of its trade secrets, to do so.  This is not a proper use of the litigation process.  *See, e.g.,* Restatement (Second) of Torts § 767 (1979) (noting that use of litigation is wrongful if party intends only to harass and not to bring claim to definitive adjudication).

There is also a Protective Order, which has been entered in this matter.  [Dkt. #29.]  Under the terms of the Protective Order, documents may be marked "Confidential" or "Highly Confidential."  (Resp. to SOF at 57.)  The "Highly Confidential" designation is to be limited to "extremely sensitive 'Confidential Information or Items' whose disclosure to another party or non-party would create a substantial risk of injury…. (*Id*. at 58.)  Documents designated "Highly Confidential" cannot be shared with the named parties in the litigation unless the named party is a "person who created, sent, or received the document in the ordinary course of business as demonstrated by the evidence…."  (*Id*. at ¶ 59.)  Further, under the Protective Order, documents designated "Confidential" or "Highly Confidential" are not to be filed with the Clerk of Court unless the procedure set forth in Colorado Local Rule 7.2 is followed.  (*Id*. at ¶ 60.)  Nearly all of the approximately 2,500 pages of documents produced by Wells Fargo were designated "Highly Confidential" by Wells Fargo.  Due to these designations, not only was access to the documents

restricted, but Ms. Wong and Messrs. McQuate and Prouty spent significant time and resources selecting the exhibits attached to their Motion for Summary Judgment so as to not be required to file the motion under seal. Wells Fargo, on the other hand, included documents marked "Highly Confidential" in its publicly filed Motion for Summary Judgment. [Dkt. # 58-15, 58-16, 58-17.] This is sufficient evidence to allow a jury to find that Wells Fargo has misused the legal process.

### 3.   A reasonable jury could also find that Wells Fargo's lawsuit is devoid of factual or legal support.

The second element of an abuse of process claim can also be established by showing that the lawsuit is "sham litigation," i.e., devoid of factual or legal support. *Mrs. Colorado-America, Inc.*, 2007 WL 496690 at * 2. As set forth in Defendants' Motion for Summary Judgment, which is incorporated herein, Wells Fargo's claims against Defendants are devoid of legal and factual support. [Dkt. #57.] Further, despite contrary case law, Wells Fargo has consistently relied on the fact that two clients left soon after Ms. Wong and Messrs. McQuate and Prouty resigned to supports its claims. *See American Family Mut. Ins. Co.*, 2011 WL 782574 at *6 (holding that employer's suggestion that the cancellation of policies by customers is proof that former employee used customer's information is a classic example of the "*post hoc*" fallacy). Accordingly, a reasonable jury could find that Wells Fargo's claims are devoid of factual and legal support and Wells Fargo is not entitled to summary judgment on Defendants' abuse of process claims.

### C.   Wells Fargo is not entitled to summary judgment on Ms. Wong and Messrs. McQuate and Prouty's tortious interference with prospective business relations claims.

To establish a claim for tortious interference with prospective business relations, a plaintiff needs to show "intentional and improper interference preventing the formation of a contract." *Klein v. Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995). Interference can either be (1) "inducing or causing a third party not to enter into or continue relations" or (2) "preventing the plaintiff from acquiring or continuing the relations." *Id*. "[T]he crucial question in determining liability for

tortious interference…is whether the defendant's interference was intentional and improper." *Occusafe, Inc. v. EG&G Rocky Flats Inc.*, 54 F.3d 618, 622 (10th Cir. 1995) (*quoting Cronk v. Intermountain Rural Elec. Ass'n.*, 765 P.2d 619, 623 (Colo. App. 1988).

### 1.   A reasonable jury could find that Wells Fargo engaged in improper conduct.

Wells Fargo argues that Ms. Wong and Messrs. McQuate and Prouty need to show that "Wells Fargo brought its claims ***solely*** for an improper purpose and that Wells Fargo did not subjectively believe the validity of its claims." [Dkt. #58, p. 11.]  The Colorado Supreme Court, however, has indicated that there are seven factors a court should consider in determining whether there has been improper interference with prospective business relations:  "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interest of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995) (citing Restatement (Second) of Torts § 767 (1979)).  Contrary to Wells Fargo's assertions, Wells Fargo's purpose or motive for initiating this lawsuit is just one factor to consider in the analysis.

Wells Fargo incorrectly claims that the filing of this lawsuit cannot satisfy the requirement of "wrongful means" for purposes of this claim.  [Dkt. #58, p. 11.]  Wells Fargo cites *Nobody in Particular Presents, Inc.*, for the premise that "[a] defendant does not engage in improper conduct, so as to be liable for intentional interference, if…the defendant's purpose is, at least in part, to advance its own interests."  [*Id.* at p. 12.]  The section omitted by Wells Fargo in this quote, however, indicates that the defendant's purpose is only one element of four required to show that a party did not engage in improper conduct.  Specifically, the District Court of Colorado held that

> "[a] defendant . . . does not engage in improper conduct, so as to be liable for intentional interference, if:  (1) it concerns a matter of competition between the defendant and plaintiff; (2) the defendant does not employ wrongful means; (3) the action does not amount to an unlawful restraint of trade, **and** (4) the defendant's purpose is, at least in part, to advance its own interests.

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'n, Inc.*, 311 F.Supp.2d 1048, 1119 (D. Colo. 2004) (emphasis added) (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1995).

Colorado relies on the Restatement to define the elements of tortious interference with business relations.  *See, e.g., Caven v. American Fed. Sav. and Loan Ass'n of Colo.*, 837 F.2d 427, 431 (10th Cir. 1988).  The use or threat of civil litigation is improper "if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication."  Restatement (Second) of Torts § 767 cmt. c (1979).  Conduct that violates a statutory provision or is contrary to established public policy is also an example of improper interference.  *Id.*

Wells Fargo has engaged in several acts of improper interference. A reasonable jury could find that this lawsuit was brought in bad faith and is devoid of legal and factual support.  Additionally, it is unlawful, under Colorado law, to "use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit."  C.R.S. § 8-2-113.  Prior to initiating this lawsuit, Wells Fargo sent individual letters to Ms. Wong and Messrs. McQuate and Prouty stating that in order to avoid litigation, each of them must provide a statement representing, among other things, that they would not "solicit or accept business from" any of their former accounts.  (Resp. to SOF at 55.)  Nothing in their agreements prevent Ms. Wong or Messrs. McQuate and Prouty from accepting business from their former accounts.  (*Id.* at 61.)  The letter was overstated and a reasonable jury could find it was an improper

threat utilized to prevent Ms. Wong and Messrs. McQuate and Prouty from competing with Wells Fargo.

Furthermore, throughout this litigation, Wells Fargo has maintained an extremely broad definition of the term "solicit," one that is not consistent with Colorado case law or the common definition of the term.  At the Rule 30(b)(6) deposition, Wells Fargo defined "solicit" as any contact or communication regardless of whether the client reaches out to the former employee. (Resp. to SOF at 62.)  This is an unreasonable definition.  The Colorado Court of Appeals has defined "solicit" as "to approach with a request or plea."  *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001), *abrogated on other grounds*.  Despite this authority, Wells Fargo, through a letter from its counsel on January 21, 2015, threatened Defendants that it "may be compelled to seek court intervention" due to information it had received regarding an invitation from one of its clients to Ms. Wong and Messrs. McQuate and Prouty requesting they bid on the client's business.  (Resp. to SOF at 63.)

Additionally, Wells Fargo has overstated the number of clients involved in this matter. In Plaintiff's Responses and Objections to Defendant Paul Prouty's First Set of Interrogatories, Wells Fargo claims that Ms. Wong and Messrs. McQuate and Prouty managed, serviced, or possessed information concerning over 140 accounts while they were employees of Wells Fargo.  (Resp. to SOF at 64.)  Defendants did not manage, service or possess information concerning all of these accounts.  (*Id*. at 65.)   In fact, they were unaware of and had no knowledge of a number of the accounts and never met with or spoke with others while employees at Wells Fargo.  (*Id*. at 66, 67.) Further, it is Defendants' understanding that several of these accounts were not customers or prospective customers of Wells Fargo.  (*Id*. at 68.)  Nonetheless, out of fear of additional accusations in this lawsuit and the attendant costs of litigation associated therewith, Defendants

have not contacted companies identified by Wells Fargo, all of whom are potential customers. (*Id.* at 69.) A reasonable jury could find that Wells Fargo improperly interfered with Ms. Wong and Messrs. McQuate and Prouty's prospective business relations.

### 2. Ms. Wong and Messrs. McQuate and Prouty are not required to identify specific third parties with whom Wells Fargo interfered.

Wells Fargo claims it is entitled to summary judgment because Defendants have failed to identify specific relationships that Wells Fargo has interfered with. [Dkt. #58, p. 10.] The cases cited by Wells Fargo, however, do not support this argument. In each of the cases cited, the plaintiffs did identify specific relationships, but the courts did not hold that this was a requirement. [*See id.* (cases cited by Wells Fargo)]. To the contrary, several Colorado courts have held that to prove a tortious interference with prospective business relations case it is not necessary to identify a specific customer. *See, e.g., Pers. Dept., Inc. v. Prof. Staff Leasing Corp.*, 297 Fed. Appx. 773, 777 (10th Cir. 2008) (quoting *Ervin v. Amoco Oil Co.*, 885 P.2d 246, 254 (Colo. App. 1994), *rev'd on other grounds*).

### 3. A reasonable jury could find that Ms. Wong and Messrs. McQuate and Prouty had a reasonable likelihood of contracting with a third party.

Wells Fargo also claims that Ms. Wong and Messrs. McQuate and Prouty's claims must fail because they did not "produce any evidence that there was a concrete possibility of contracting with any third party…." [Dkt. #58, p. 11.] A "concrete possibility," however, is not required to establish a claim. *See, e.g., Pers. Dept., Inc.*, 297 Fed. Appx. at 777.

The case cited by Wells Fargo, *Hertz v. Luzenac Group*, is distinguishable from this case as the plaintiff in *Hertz* alleged that the defendant improperly induced a third party to not continue a relationship with the plaintiff. 576 F.3d at 1119 (holding that third party's correspondence that it had "other priorities" and would not be able to consider plaintiff's proposal for several months, was not sufficient to establish a reasonable probability of a future contract). As explained above,

15

unlike in *Hertz*, Ms. Wong and Messrs. McQuate and Prouty are alleging that Wells Fargo prevented them from acquiring and continuing business relationships.  For this reason, the case of *Bartch v. American Family Mut. Ins. Company*, is more on point.  No. 13-cv-01931-RBJ, 2014 WL 3260932 at *4-5 (D. Colo. July 8, 2014).

In *Bartch*, the court denied summary judgment despite the plaintiff's inability to identify specific customers.  The court held that given that the employee's former employer "effectively precluded [the employee] from contacting the customers and soliciting their business, his inability to identify specific customers who would have stayed [with him] is not particularly surprising." *Id*. at *4.  The court also noted that it would not be "particularly surprising that at least some customers whom [the employee] had served over his long career might well have wished to continue to have him serve as their insurance agent…." *Id*.

Similar to *Bartch*, summary judgment is not appropriate here because a reasonable jury could find that Ms. Wong and Messrs. McQuate and Prouty had a reasonable likelihood of future business with various third parties.  Specifically, one customer stated that it did not want to get in the middle of the "divorce" between Wells Fargo and Messrs. McQuate and Prouty.  (*Id*. at 70.) Further, because of Wells Fargo's overly broad definition of "solicit" and overly inclusive list of proposed or actual clients, Ms. Wong and Messrs. McQuate and Prouty have not conducted webinars, sent informative newsletters, or provided handouts to mining companies.  (*Id*. at 71.) Ms. Wong and Messrs. McQuate and Prouty have also been forced to ask some of their business partners to not provide introductions or references for fear of additional accusations.  (*Id*. at 72.) These lost opportunities combined with Ms. Wong and Messrs. McQuate and Prouty's historically strong relationships with their customers and in the mining industry are sufficient to allow a jury

to conclude that they had reasonable expectations of continued business with one or more of their customers.

Summary judgment is also inappropriate because Ms. Wong and Messrs. McQuate and Prouty's success on this claim depends, in part, on the validity of their contracts with Wells Fargo. *Nobody in Particular Presents, Inc.*, 311 F.Supp.2d at 1119-20 (holding plaintiff's intentional interference with prospective business relationship claim survives summary judgment because it depended on plaintiff's success on another claim at trial). If Ms. Wong and Messrs. McQuate and Prouty's contracts are invalid, then Wells Fargo has improperly interfered with their ability to solicit any potential mining clients.

**D. Wells Fargo is not entitled to summary judgment on Messrs. McQuate and Prouty's claims under the Colorado Wage Claim Act – C.R.S. § 8-4-101 *et seq.***

Under the Colorado Wage Claim Act ("CWCA"), wages and compensation owed to an employee who resigns become due and payable upon the next regular payday. C.R.S. § 8-4-109 (2007) (amended 2015). Vacation pay is specifically included in the definition of wages. C.R.S. § 8-4-101(8)(a)(III) (2007) (amended 2015).

**1. There is no meaningful distinction between vacation pay and PTO.**

Based on Colorado case law, statutes, and guidance from the Colorado Department of Labor, vacation pay is tantamount to wages and there is no meaningful distinction between vacation pay and PTO. *See* Joshua D. Brown, *'Use it or Lose It' Benefit Policies and the Colorado Wage Claim Act,* 41-JUN Colo. Law. 39 (June 2012). In fact, Wells Fargo itself uses the terms interchangeably. In its Separate Statement of Undisputed Material Facts, Wells Fargo admits that Mr. Prouty's reference to "PTO days" was a reference to vacation time. (Wells Fargo's Statement of Undisputed Material Facts ("SOF") at 33.)

17

Further, both Mr. McQuate and Mr. Prouty put Wells Fargo on sufficient notice through their counter-claims of the type of pay they are seeking.  Mr. McQuate stated that he is seeking the vacation pay owed to him under the terms of the same employment agreement that Wells Fargo is seeking to enforce against him.  (Dkt. #36-1, p. 19-20 at ¶ 25.)  Similarly, Mr. Prouty stated that he is seeking the vacation pay provided him under the terms of Wells Fargo's Employee Handbook.  (Dkt. #37-1, p. 20 at ¶ 28.)  Additionally, in their disclosures, Messrs. McQuate and Prouty provide a computation of damages as to their claims for vacation pay referencing Wells Fargo's "PTO" allowance.  (Resp. to SOF at 73.)  Thus, Wells Fargo had sufficient notice that Messrs. McQuate and Prouty are seeking their earned and determined leave pay whether that leave is termed "vacation" or "PTO."

To the extent Wells Fargo is arguing that the CWCA does not entitle Messrs. McQuate and Prouty to any leave other than vacation pay, this assertion is incorrect.  [Dkt. #58, p. 14.]  The Colorado Supreme Court has held that "[a]lthough 8-4-101(8)(a)(III) of the Wage Claim Act refers only to 'vacation' pay, other forms of leave (such as sick leave) may be compensation for services performed where the employee has an enforceable right to receive payment for such leave."  *In re Marriage of Cardona and Castro*, 316 P.3d 626, 634 (Colo. 2014).  "Whether an employee has an enforceable right to be paid for accrued leave will depend on the terms of any agreement between the employee and the employer."  *Id.*  A vacation policy may be established by an employer in writing or by custom and practice.  Colorado Dept. of Labor and Employment, Advisory Bulletin, Vacation Pay, 5(I) (Mar. 31, 2012).  Ms. Wong was paid for accrued leave upon her departure from Wells Fargo.  (Resp. to SOF at 74.)  Thus, a reasonable jury could find that Wells Fargo had a custom of paying employees out for accrued PTO upon their departure.

### 2. A reasonable jury could find that Messrs. McQuate and Prouty are entitled to vacation pay.

According to Wells Fargo's policies, only employees with a salary or an hourly wage are eligible for PTO. (SOF at 11.) According to Mr. Lindstrom, in his declaration filed in Support of Wells Fargo's Motion for Summary Judgment, Wells Fargo did not pay Mr. McQuate or Mr. Prouty a salary or hourly wage. [Dkt. #58-2, ¶ 8.] In its Motion, Wells Fargo now claims that "Wells Fargo's Sales Executives and Senior Sales Executives are not paid a salary or hourly wage; instead, Wells Fargo pays these job titles on a *commission* pay plan, which provides a regular, forgivable draw until their annual revenues reach four times the value of their annual draw, at which point the employee receives additional sales commissions." (SOF at 15) (emphasis added.) At the Rule 30(b)(6) deposition, however, Mr. Lindstrom, on behalf of Wells Fargo, affirmed that Mr. Prouty's salary was *not* commission based. (Resp. to SOF at 15.) When asked to explain how Mr. Prouty was paid, Mr. Lindstrom stated "basically, it's – it's a draw to a salary…". (*Id.*) With respect to Mr. McQuate, Mr. Lindstrom testified that he believed Mr. McQuate "was paid a commission until the sale. And then I believe he negotiated a salary – a forgivable draw salary after the sale" to USI. (*Id.*) Mr. Lindstrom further admitted that he did not know the impact of the sale on Mr. McQuate's income or what was negotiated or offered to him. (*Id.*) Accordingly, based on Wells Fargo's contradictory testimony alone, a reasonable jury could find that Messrs. McQuate and Prouty were salaried employees and entitled to vacation or PTO pay.

Vacation policies can also be established by custom or practice even if such customs or practices are contrary to a company's written policy. *See Miller v. Jehn Eng'g*, No. 09CV4901, 2010 WL 6001642 (Jefferson Cnty. Dist. Ct. Feb 19, 2010) (holding that employer "cannot ignore the policy manual limiting PTO to 80 hours in practice and then at the same time rely on the policy manual as a legal defense"); *see also* Colorado Dept. of Labor and Employment, Advisory

Bulletin, Vacation Pay, 5(I).  At the time he was hired, Mr. Prouty was told by his supervisor that he would get two weeks vacation per year.  (Resp. to SOF at 16.)  Additionally, Mr. McQuate's Employment Agreement, which Wells Fargo is attempting to enforce against him, specially states that he "shall be entitled to a vacation in accordance with Employer's policy, during which time his or her compensation shall be paid in full."  (*Id*.)  Therefore, a genuine dispute exists as to whether or not Wells Fargo followed its own policy, and summary judgment is not appropriate on Messrs. McQuate and Prouty's claims for violations of the CWCA.

### 3. A reasonable jury could find that Messrs. McQuate and Prouty are entitled to penalties, attorney fees and costs.

Wells Fargo argues that because Messrs. McQuate and Prouty did not properly "demand" payment, they are not entitled to penalties, attorney fees, or costs.  This argument ignores the fact that penalties and attorney fees and costs are authorized by different sections of the CWCA.  An award of attorney fees and costs is not contingent on a proper demand.  C.R.S. § 8-4-110; *Giuffre v. Marys Lake Lodge, LLC*, No. 11-cv-00028-PAB-KLM, 12-cv-00377-PAB, 2013WL 673987 at *6 (D. Colo. Feb. 25, 2013) (holding that plaintiff's claim for compensatory damages, attorney fees and litigation expenses was not barred by plaintiff's failure to make a demand).  Rather, there is a presumption that a prevailing employee on a CWCA claim is entitled to an award of attorney fees.  *Lester v. Career Bldg. Acad.*, 338 P.3d 1054, 1061 (Colo. App. 2014).  As such, Wells Fargo's claim that it is entitled to summary judgment on Messrs. McQuate and Prouty's claims for attorney fees and costs is incorrect as a matter of law.

With respect to penalties, the CWCA authorizes statutory civil penalties when an employer fails to pay an employee's determinable wages and compensation within fourteen days of receiving a demand.  C.R.S. § 8-4-109 (2007) (amended 2015).  There are only two requirements set forth in the CWCA concerning the written demand:  (1) it must be made within 60 days of separation,

and (2) it must state where payment can be received.  C.R.S. § 8-4-109 (2007) (amended 2015); *Damitio v. Sushi Zanmai Inc.*, No. 12-cv-2603-JLK, 2013 WL 136186 at *1 (D. Colo. Jan. 10, 2013).  The CWCA does ***not*** require the demand to state a specific amount.  C.R.S. § 8-4-109 (2007) (amended 2015); *see also Reyes v. Snowcap Creamery, Inc.*, No. 11-cv-02755-WJM-KMT, 2013 WL 4229835 at *7 (denying employer's motion for summary judgment as it cited no case authority for proposition that an employee must specify a particular amount); *Damitio*, 2013 WL 136186 at *1 (holding that plaintiff's complaint which asked for all tip credits taken against her wages was a sufficient demand under the CWCA).

There is no dispute that Messrs. McQuate and Prouty sent Wells Fargo written correspondence referencing vacation time or PTO within sixty days of their separation from Wells Fargo.  (SOF 32, 33.)  Specifically, in his August, 22, 2014 letter, Mr. McQuate stated "[p]lease include in my final compensation any accrued vacation time and benefits." (*Id*. at 32.)  Similarly, Mr. Prouty stated, "please be advised since I joined WFIS …I have only taken a total of 4 PTO days – 2 days in 2013 and 2 days in 2014." (*Id*. at 33.)  A reasonable jury could find that through these statements Messrs. McQuate and Prouty were demanding payment of their accrued and unused vacation pay.

Nothing in the CWCA prohibits an employer from directly depositing wages into an employee's bank account if the employee voluntarily authorized such payment.  C.R.S. § 8-4-102(2).  Mr. McQuate authorized Wells Fargo to directly deposit his paychecks and this was in fact how his final compensation was made.  (Resp. to SOF at 75.)  Thus, Mr. McQuate notified Wells Fargo that his owed vacation pay should be directly deposited when he stated that it should be included in his final compensation.  Mr. Prouty also authorized direct deposit of his wages and provided in his August 22, 2014 letter to Wells Fargo his home phone number.  (*Id*. at 76, 77.)

Based on these facts, a reasonable jury could find that both Mr. McQuate and Mr. Prouty provided sufficient information to Wells Fargo such that payment could be sent.  As such, a reasonable jury could find that their demands were sufficient to entitle Messrs. McQuate and Prouty to penalties under the CWCA.  *See, e.g. Damitio*, 2013 WL 136186 at * 1 (finding statement "payment can be made care of undersigned counsel" sufficient to meet CWCA demand requirement.)

## IV.    <u>CONCLUSION</u>

There are genuine issues of material fact involved in all of Ms. Wong and Messrs. McQuate and Prouty's counterclaims.    Accordingly, Ms. Wong and Messrs. McQuate and Prouty respectfully request that the Court deny Plaintiff's Motion for Summary on all Counterclaims.


Dated:   July 6, 2015.


Respectfully submitted,

*s/ Amy L. Miletich*
Amy L. Miletich
MiletichCohen PC
1660 Wynkoop, Suite 1160
Denver, Colorado 80202
Telephone: (303) 825-5500
Email: amiletich@mcpclaw.com
*Counsel for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of July, 2015, I electronically filed the foregoing **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTERCLAIMS** with the Clerk of Court using the CM/ECF system, which will send electronic notification of this filing to:


Mr. Timothy M. Kratz
Mr. Christopher T. Patrick
Jackson Lewis P.C.
950 17th Street, Suite 2600
Denver, Colorado 80202
Tim.Kratz@jacksonlewis.com
Christopher.Patrick@jacksonlewis.com

Mr. Peter R. Bulmer
Jackson Lewis P.C.
150 North Michigan Ave., Suite 2500
Chicago, Illinois 60601
bulmerp@jacksonlewis.com


By:   /s/Amy L. Miletich
　　　Amy L. Miletich
　　　MiletichCohen PC
　　　1660 Wynkoop - Suite 1160
　　　Denver, CO  80202
　　　AMiletich@mcpclaw.com
　　　(303) 825-5500
　　　(303) 515-6655 (fax)
　　　*Counsel for Defendants*